Neal Weingart, OSB No. 066551
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
(503) 379-9933 Telephone
1(888) 957-8392 Facsimile
neal@nealweingartlaw.com

Christopher A. Larsen, OSB No. 910679
PICKETT DUMMIGAN WEINGART LLP
210 SW Morrison St., 4th Floor
Portland, OR 97204
T: 503.223.7770
F: 503.227.2530
chris@pdw.legal

*Of Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| GENA GAHR, personal representative for the Estate of MATTHEW GAHR, deceased,<br><br>    Plaintiff,<br><br>    v.<br><br>MARION COUNTY, an Oregon County, JOE KAST, an individual, TAD LARSON, an individual, BOBBIE FRANCE, an individual, BRYAN NGUYEN, an individual, DONNA MILLAN, an individual, MATTHEW LIPSCOMB, an individual, SARAH LAPHAM, an individual, JASON TILLSON, an individual, WILLIAM MCLAUGHLIN, an individual, LISA STEWART, an individual, DAVID WEAR, an individual, and SALEM PSYCHIATRIC ASSOCIATES P.C., an Oregon corporation,<br><br>    Defendants. | Case No.  6:22-cv-01188-MK<br><br>**FIRST AMENDED COMPLAINT**<br>Wrongful Death; Negligence; Violation of Civil Rights (42 U.S.C. §1983); 42 USC 12101 *et seq*, ORS 659A.103 *et seq*<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.

On April 28, 2020**,** Matthew Jonathan Gahr (then age 52) was booked into the Marion County Jail following an arrest for allegations relating to a domestic dispute with an ex-girlfriend. Mr. Gahr had a history of severe mental illness including depression and bipolar disorder requiring medication, and was considered fully disabled due to his diagnosis, and had at least one prior suicide attempt. Mr. Gahr's mental illness and disability and need for medication was known to the staff at the jail, including the medical and mental health providers such as the intake nurse and the nurse practitioner who oversaw the provision of medications, as a result of Mr. Gahr's extensive prior interactions with the jail, repeated disclosures, and access to Mr. Gahr's medical history. These medical providers had ample documentation of Mr. Gahr's prior mental illness including his lithium prescription and bipolar disorder diagnosis. During this 50-day stay at the Marion County jail, Mr. Gahr received a cursory mental health assessment at intake, and was denied a prescription for Lithium. He was never assessed after 15 days pursuant to jail policy for physical and mental health and was never placed on suicide watch. On the evening of June 16, 2020, Mr. Gahr was found hanging in his cell. He was transported to Salem Health Hospital and died on June 17, 2020 at 4:27 p.m.

## JURISDICTION AND VENUE

2.

Venue is proper within the United States District Court for the District of Oregon Eugene Division because all of the events giving rise to this claim occurred in the State of Oregon, and all Defendants reside, operate, or work in the State of Oregon. Specifically, all of the acts and practices alleged herein occurred at the Marion County Jail in Salem,

Oregon. Marion County and other defendants appropriately removed this action to the United States District Court for the District of Oregon on August 12, 2022.

3.

This action arises under the constitution and laws of the United States and the State of Oregon. This Court has jurisdiction over this matter.

**PARTIES**

4.

Plaintiff Gena Gahr is the duly appointed personal representative of the Estate of Matthew Gahr, deceased. Matthew Gahr was born in Portland, Oregon on April 9, 1968. At the time of his death, he was a resident of Marion County, Oregon. He is survived by his daughter, Gena Gahr. Gena Gahr is an adult currently residing in Hillsboro, Washington County, State of Oregon.

5.

At all times relevant herein, Matthew Gahr was a detainee in the Marion County Jail.

6.

Defendant Marion County ("Marion County" or "the County") is a county in the state of Oregon. At all times material to this Complaint, the Marion County Jail was obligated to provide services which promote and protect the health of the adults and juveniles entrusted to its care. This includes providing medically acceptable treatment and accommodations for inmates with diseases and conditions. Defendant Marion County is a "public body" within the meaning of Oregon Revised Statutes chapter 30. Marion County Sheriff's Office ("MCSO") is a corporate entity and "arm" of the county acting under color of state law. Marion County Jail ("Jail") is a corporate entity and "arm" of the

county acting under color of state law.

7.

Joe Kast ("Kast") is the duly elected Sheriff of Marion County. At all times pertinent, Mr. Kast was employed by Marion County as Sheriff. Mr. Kast is an agent of Marion County, actual or implied, acting within the course and scope of his agency. Upon information and belief, he is a citizen and resident of the State of Oregon.

8.

Tad Larson ("Larson") is the Commander of the Marion County Jail. At all times pertinent, Mr. Larson was employed by Marion County as a Commander of the Marion County Jail. Mr. Larson is an agent of Marion County, actual or implied, acting within the course and scope of his agency. Upon information and belief, he is a citizen and resident of the State of Oregon.

9.

Bobbie France ("France") is a registered nurse licensed in the State of Oregon. At all times pertinent, Mr. France was employed by Marion County as a corrections nurse. Mr. France is an agent of Marion County, actual or implied, acting within the course and scope of his agency. Upon information and belief, he is a citizen and resident of the State of Oregon.

10.

Bryan Nguyen ("Nguyen") is a registered nurse licensed in the State of Oregon. At all times pertinent, Mr. Nguyen was employed by Marion County as a corrections nurse. Mr. Nguyen is an agent of Marion County, actual or implied, acting within the course and scope of his agency. Upon information and belief, he is a citizen and resident of the State of Oregon.

///

Page 4 – **FIRST AMENDED COMPLAINT**

11.

Donna Millan ("Millan") is a family nurse practitioner licensed in the State of Oregon. At all times pertinent, Ms. Millan was employed by Marion County as a corrections nurse practitioner or contracted with Marion County to provide services in such a role. Ms. Millan, at all relevant times, was acting as an agent of Marion County, actual or implied, and was acting within the course and scope of her agency. Upon information and belief, she is a citizen and resident of the State of Oregon.

12.

Sarah Lapham is a doctor or medical practitioner licensed in the State of Oregon. At all times pertinent, Ms. Lapham was employed by Marion County as the Corrections Health Program Supervisor for Inmate Medical Services. Ms. Lapham, at all relevant times was an agent of Marion County, actual or implied, acting within the course and scope of her agency. Upon information and belief, she was a citizen and resident of the State of Oregon.  Plaintiff, in the exercise of reasonable care, could not have discovered the identity of Ms. Lapham until after disclosure of document discovery in this lawsuit, which occurred on November 18, 2022.

13.

At all relevant times, Jason Tillson was a Marion County Sheriff's Deputy assigned to inmate classification. Mr. Tillson was employed by Marion County. Mr. Tillson was an agent of Marion County, actual or implied, acting within the course and scope of his agency. Upon information and belief, he is a citizen and resident of the State of Oregon. Plaintiff, in the exercise of reasonable care, could not have discovered the identity of Deputy Tillson, or his connection to Plaintiff's underlying claims, until after disclosure of document discovery in this lawsuit, which occurred on November 18, 2022.

///

14.

At all relevant times, William McLaughlin and Lisa Stewart were Marion County employees or agents of Marion County, who performed the duties of Qualified Mental Health Professionals (QMHP) within the Marion County Jail.  As QMHPs, their duties included: screening and reviewing inmates for mental health concerns, evaluating inmates for suicide risk, and referring inmates for prescription of psychiatric medications.  Plaintiff, in the exercise of reasonable care, could not have discovered the identity of Mr. McLaughlin and Ms. Stewart, or their connection to Plaintiff's underlying claims, until the disclosure of the identity of Marion County's QMHPs, which occurred on February 17, 2023, in an email to Plaintiff's counsel.

15.

At all relevant times, David Wear was a psychiatric mental health nurse practitioner, who was employed by Salem Psychiatric Associates P.C.  Salem Psychiatric Associates P.C. is a professional corporation which provides mental health services, with a principal place of business in Salem, Oregon and was doing business as Valley Mental Health.

16.

At all relevant times, while acting in the course and scope of his employment for Salem Psychiatric Associates, P.C., Mr. Wear and Marion County contracted with each other for the purpose of employing Mr. Wear as the Psychiatric Mental Health Nurse Practitioner (PMHNP) for the Marion County Jail.

17.

At all relevant times, in their capacity as the PMHNP for the Marion County Jail, Mr. Wear and Salem Psychiatric Associates, P.C. had a duty to review the medications for inmates with mental health needs, as well as evaluate those inmates for changes related to their mental health medication needs. Plaintiff, in the exercise of reasonable care, could not

have discovered the identity of Mr. Wear or Salem Psychiatric Associates, P.C. or their connection to Plaintiff's underlying claims, until after disclosure of document discovery in this lawsuit, which occurred on November 18, 2022.

18.

At all material times herein, all Defendants acted under color of law.

19.

At all material times herein, all individuals acted within the course and scope of employment, and in furtherance thereto.

20.

All individual Defendants are sued in their individual capacities as relates to claims under of law pursuant to 42 USC 1983. All individual Defendants are sued in their official capacities as relates to claims under course and scope of their employment pursuant to laws of the State of Oregon.

## TORT CLAIM NOTICE

21.

On or around June 3, 2021, tort claim notice was properly given to the Marion County Defendants pursuant to the Oregon Tort Claims Act, ORS 30.275.

## FACTUAL ALLEGATIONS

22.

Marion County Jail houses pretrial detainees and persons convicted of crimes. Marion County is obligated by state and federal law to provide medical and mental health care for persons lodged in the Marion County Jail. Marion County's duty to provide medical and mental health care is a nondelegable duty.

Page 7 – **FIRST AMENDED COMPLAINT**

23.

Oregon Administrative Rules ("OAR") 291-076-0010(3) expresses the legislature's policy that Oregon's Department of Corrections must "provide medical assistance whenever an inmate demonstrates, or is reported to be at risk of self-destructive behavior."

24.

OAR 291-076-0020(3) provides that inmates at risk must be given a "suicide assessment," which is defined as "a brief but formal assessment of mental status conducted by a mental health provider or registered nurse in consultation with the mental health provider, concluding with a judged level of suicidal risk."

25.

OAR 291-076-0020(5) provides that an inmate judged to be at "moderate risk" of suicide must be placed on "suicide close observation," which requires that "unobstructed visual observation of the inmate is required at staggered intervals, not to exceed 15 minutes, with recorded observation within each 15-minute interval."

26.

OAR 291-076-0020 (7) requires that an inmate judged to be at "high risk" of suicide must be placed on "suicide watch," which requires that "unobstructed one-to-one view of the inmate is required at all times with recorded observation within each 15-minute interval."

27.

Marion County Jail certifies that the level of service it provides complies with the Oregon Accreditation Alliance's criteria. Marion County Jail also complies with the requirements of the Oregon State Sheriff's Association's Oregon Jail Standards, which it voluntarily adopted in 2000.

///

Page 8 – **FIRST AMENDED COMPLAINT**

28.

Oregon Jail Standard B-107 requires all jails to have policies and procedures relating to the intake of inmates in need of immediate attention for a serious medical need or mental health need. It requires that such persons be examined by a physician, nurse practitioner or physician's assistant and defines a medical need as serious "if it has been diagnosed as such by a physician or if it were so obvious that a layman would recognize the need for medical care as a serious need." Standard B-208 requires medical intake screening, including obtaining "mental health history diagnosis, and treatment" information and "suicidal thoughts, attempts or feelings." Standard B-209 requires a jail to maintain policies and procedures regarding suicide risk screening. This requires jails to screen for previous suicide attempts, current state of mind and suicidal ideations, information from arrest or transport authorities related to observed or noted risk factors, a family history of suicide or suicide attempts, and scars or other physical manifestations of previous suicide attempts. B-209(c) notes that "if an arrestee has previously been lodged in a jail, staff should determine whether the inmate previously was at risk to commit suicide or engage in other self-destructive behavior or attempts, if that information is readily available," and B-209(d) requires the jail to "take appropriate steps to manage the risk" if "information is discovered or if an arrestee discloses information that indicates that they are a suicide risk."

29.

Pursuant to these standards Marion County Jail has promulgated Policy 2191 regarding mental illness. Policy 2191 requires deputies who have encounters with persons who are known or suspected to be mentally ill to interact "in a manner that does not further compromise the deputies' safety or the safety of others."

///

Page 9 – **FIRST AMENDED COMPLAINT**

30.

Marion County Jail maintains Policy 3110 (based on Oregon Jail Standards B-210 and E-601) pertaining to Adult In Custody ("AIC") Suicides. Policy 3110 requires staff performing intakes of AIC's to complete a Health Screening Form and observe arrestees for depressed and/or suicidal behavior. Staff are required to report their observations immediately to Health Services Staff and shift supervisors. AIC's placed on suicide watch are housed in the lower tier of the infirmary C-4 unit. Deputies are required to conduct safety and security checks at least every 15 minutes and log such checks immediately. Any deputy may initiate a suicide watch.

31.

Marion County Jail's Handbook for Adults In Custody indicates that if an inmate has a disability or handicap that affects their "ability to see, speak, hear, walk or understand" that they may ask for assistance or accommodation.

32.

At all material times herein, it was widely known throughout the correctional field and extensively documented that suicides in jail occur at a rate several times greater than the general public. For instance, a recent study from the U.S. Department of Justice Bureau of Justice Statistics found that suicide has been the leading cause of death in jails every year since 2000.[1] Oregon Public Broadcasting reported in 2019 that the suicide rate in Oregon exceeded the national average, with suicide by hanging constituting the leading single cause of death in Oregon and Washington jails.[2] A 2010 study published by the

---

[1] U.S. Dep't of Justice, *Mortality in Local Jails, 2000-2019 – Statistical Tables*, BUREAU OF JUSTICE STATISTICS, Dec. 2021 (available at: https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf); *see also* U.S. Dep't of Justice, *Mortality in Local Jails and State Prisons, 2000-2013 – Statistical Tables*, BUREAU OF JUSTICE STATISTICS, Aug. 2015 (available at: https://bjs.ojp.gov/content/pub/pdf/mljsp0013st.pdf).
[2] Conrad Wilson, Tony Schick, Austin Jenkins & Sydney Brownstone, *Booked and Buried: Northwest Jails' Mounting Death Toll, OPB*, Apr. 2, 2019 (available at: https://www.opb.org/news/article/jail-deaths-oregon-washington-data-tracking/); Conrad Wilson,

U.S. Department of Justice National Institute of Corrections reported that 47% of jail

suicides were detainees who had a history of substance abuse, 38% of jail suicides were

detainees who had a history of mental illness, and 70% of jail suicides occurred within

four months of confinement.[3] A 2021 study published by Disability Rights Oregon found

that "[O]ver than half of the ten people who died in Oregon jails between January 1, 2020

and October 31, 2020 had mental illness or substance abuse disorder."[4] A 2003 study

published by the Human Rights Watch reports, "[y]oung men, persons with mental illness,

alcohol and drug addicts, and people who are in custody, are amongst the most at-risk

groups for suicide."[5]

### Mr. Gahr's Mental and Medical Health History

33.

Upon information and belief, Mr. Gahr was a disabled individual.  He had been

diagnosed with bipolar disorder, and required daily medications in order to control his

behavior and mood. He was open and clear about his mental health issues with others, and

they significantly affected his ability to perform the daily activities of life. His mental

---

*Suicide Is the Leading Cause of Death in Oregon and Washington Jails*, OPB, Apr. 4, 2019
(available at: https://www.opb.org/news/article/suicide-oregon-washington-jails-death-
investigation/); *see also* Ryan Haas, *'Booked and Buried': The Scope and Scale of Northwest Jail
Deaths Revealed*, OPB, Dec. 27, 2019 (available at: https://www.opb.org/news/article/washington-
oregon-county-jails-deaths-documentary-booked-and-buried/).
[3] Lindsey Hayes, *National Study of Jail Suicide 20 Years Later*, NATIONAL CENTER ON
INSTITUTIONS AND ALTERNATIVES, Apr. 2010, at xi (available at:
http://www.ncianet.org/wp-content/uploads/2015/06/national-study-of-jail-suicide-20-years-
later.pdf).
[4] Disability Rights Oregon, *Grave Consequences: How the Criminalization of Disability Leads to
Deaths in Jail*, DISABILITY RIGHTS OREGON, Winter 2021, at 11 (available at:
https://static1.squarespace.com/static/5d645da3cf8e4c000158e55a/t/602059b3851bc700d7627bd7/1
612732852443/DRO-Report-Grave+Consequences-2021-02-08.pdf).
[5] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness*, Oct. 2003, at
186 (available at: https://www.hrw.org/reports/2003/usa1003/usa1003.pdf).

health issues led to inability to hold down stable employment, frequent suicidal ideation, difficulty in interpersonal relationships and other issues.

34.

As early as 2005, Mr. Gahr had been treated for his mental health diagnoses with a combination of medications including clonazepam for a short period of time, and ongoing but sporadic prescriptions for lithium.

35.

Bipolar disorder is a chronic illness associated with severely debilitating symptoms that can have profound effects on both patients and their caregivers, with persistently suboptimal long-term outcomes. Patients with bipolar disorder experience recurrent episodes of pathologic mood states, characterized by manic or depressive symptoms, which are interspersed by periods of relatively normal mood. During a mania, or "high" a person might experience heightened mood, low self-esteem, decreased speech, pressured speech, racing thoughts, activity at heightened levels, goal agitation, and risk-taking behavior. Typically, these episodes are followed by, but sometimes preceded by, a major depressive episode. Major depressive episode symptoms include depressed mood, loss of interest or pleasure, weight loss or gain, insomnia or hypersomnia, agitation, fatigue, worthlessness, lack of focus, significant distress or impairment, and suicidal ideation. There are two major types of bipolar disorder. Bipolar I disorder (BD I) is defined by the presence of at least one episode of mania, whereas bipolar II disorder (BD II) is characterized by at least one episode of hypomania and depression. The main distinction between mania and hypomania is the severity of the manic symptoms: mania results in severe functional impairment, it may manifest as psychotic symptoms, and often requires hospitalization; hypomania does not meet these criteria. Patients with bipolar disorder have the highest suicide rates amongst any psychiatric disorders: one study found the

lifetime incidence of at least one suicide attempt to be 29% in patients with bipolar disorder, compared to 16% for major depressive disorder.   Other studies have reported even higher rates of suicide attempts of 25%–60% during the course of bipolar disorder, with suicide completion rates of 14%–60%.  Pharmacological treatment is fundamental for successfully managing patients with bipolar disorder. Medications used in the treatment of BD include mood stabilizers (e.g., lithium, valproate, lamotrigine, and carbamazepine), atypical antipsychotics, and conventional antidepressants. Lithium, in particular, has shown efficacy in preventing recurrence of manic episodes and it is the only medication correlated with a reduced risk of suicide in patients with bipolar disorder.

36.

Mr. Gahr had a history of prior alcohol use and abuse, as well as prior methamphetamine use. His use of these substances was a result of and contributing factor to his depression and suicidal ideation and exacerbated his bipolar disorder symptoms.

### Mr. Gahr Had Prior Contacts with Marion County Jail

37.

Mr. Gahr had been booked into Marion County Jail on approximately 43 separate occasions from 1998 through 2020. These stays were of varying lengths some as short as one day, others as long as 3 months, with most averaging around a month's duration.

38.

Marion County Jail and its agents had access to Mr. Gahr's extensive medical history. He had been prescribed clonazepam as early as 2005. Medical health records from as early as 2007 note Mr. Gahr had a prescription for lithium.

39.

Marion County Jail Mental Health Intake forms from incarcerations in 2009 indicate

Page 13 – **FIRST AMENDED COMPLAINT**

that Mr. Gahr was diagnosed with bipolar disorder. In 2009, Mr. Gahr's primary care physician at the time, Dr. Zoltan Teglassy, indicated by letter that Mr. Gahr was "taking lithium for his mental health condition. He is doing very well and he is stable on his current medications." His Marion County Sheriff's Office Medication Verification form for 2009 indicates his lithium prescription.

40.

Marion County Jail Medical Disclosure Authorization forms from 2015 indicate lithium prescription, "mental health issues" and a request for psychiatric treatment records Marion County Medical Authorization For Prisoner To Be Transported Via the Northwest Shuttle forms from 2015, indicate transport for bipolar disorder.

41.

In 2015, Mr. Gahr was evaluated at Northwest Human Services (NWHS) and NWHS records indicated that he had a history of bipolar disorder, was currently taking lithium, had been treated in the past with Depakote, and that he had lifelong mental health issues.

42.

Mr. Gahr's Marion County Jail Health Intake form for 2018 indicates depression.

43.

Marion County Jail verified Mr. Gahr's medical history in 2005, 2006, 2007, 2008, 2009, 2015, 2018, and 2020. These verifications were or would have been pursuant to his intakes, and should have informed jail medical staff of his ongoing and extensive mental health history. Based on these verifications the jail knew or should have known of Mr. Gahr's lithium prescriptions, clonazepam prescription, and bipolar disorder diagnosis.

///

///

**<u>Mr. Gahr is Booked Into Marion County Jail for the Last Time</u>**

44.

On April 28, 2020, Deputy A. Connolly arrested Mr. Gahr and took him into custody to be housed awaiting trial. Mr. Gahr was booked into Marion County Jail at approximately 5:47 p.m.

45.

Upon arrival at the Jail, Nurse Nguyen conducted an intake assessment of Mr. Gahr. On Mr. Gahr's Mental Health Intake Form, Nurse Nguyen circled "Y" (for yes) when Mr. Gahr was asked if he had ever been treated for a Mental Condition and noted "3 months" under "when?" and that the treatment took place at "kaiser perm." The intake form lists a response of "N" (for no) for suicidal thoughts. It also noted: "previous medical history reviewed. No current RX noted." This previous medical history from jail records would or should have shown prior diagnoses for bipolar disorder and lithium prescription, and would or should have included prior intake forms and medication authorization forms. Mr. Gahr also notified Nurse Nguyen of a prior 30-day prescription for Lithium from December 2019.

46.

Nurse Nguyen's April 28, 2020 intake assessment of Mr. Gahr, conducted pursuant to Marion County's deficient policy, fell below the applicable standard of care. A correct assessment would not simply ask the inmate if he or she is suicidal and take them at their word. Rather, an adequate assessment would take into account both acute and chronic suicide risk factors and arrive at a standardized suicide risk score. This would be based upon not only self-report, but any available collateral sources as well (medical and mental health records). Known collateral sources should be obtained and the inmate's assessment should be updated, as appropriate, as soon as collateral sources can be reviewed.

///

Page 15 – **FIRST AMENDED COMPLAINT**

47.

Here, for example, Nurse Nguyen was informed that Mr. Gahr had previously been diagnosed for a "Mental Condition," had been transported for "Mental Health Issues," and "Bipolar Disorder," and had previously had prescriptions for lithium. Had Nurse Nguyen or any other Defendant obtained collateral sources, it would have been discovered that Mr. Gahr was in fact previously diagnosed with bipolar disorder, had a long history of prescriptions for necessary medication; and had in fact previously attempted suicide.

48.

Deputy Jason Tillson participated in the initial classification for Mr. Gahr on April 28, 2020. Classification is the initial process that determines the housing needs for an inmate. Marion County Policy 3420 provides for the management of adults in custody with "special problems" including those inmates with mental illness. Despite this policy, Deputy Tillson failed to note Mr. Gahr's extensive history of bipolar disorder, anywhere on the Marion County "intake housing classification form." Plaintiff could not have discovered the claim against Deputy Tillson's until after disclosure of document discovery in this lawsuit, which occurred on November 18, 2022.

49.

On April 28, 2020, Mr. Gahr notified Marion County Jail that he had a recent 30-day prescription for lithium from December 2019 which was filled at a Walgreens Pharmacy. Mr. Gahr's Jail Medical History indicates that on May 4, 2020, Donna Millan, FNP, reviewed Mr. Gahr's notice of and request for medication, but did not meet with him or perform any form of examination with him. She declined to prescribe any continuing prescription.

///

///

Page 16 – **FIRST AMENDED COMPLAINT**

50.

Donna Millan's conduct in failing to meet with or discuss Mr. Gahr's condition with him prior to denying him medication falls below the standard of care of a medical professional in similar circumstances. Ms. Millan did not apparently review or investigate Mr. Gahr's condition, needs, medical history or other relevant information in coming to her decision to not prescribe lithium, despite how recent his 30-day prescription was. She did not seemingly take into account that the reason his prescription had lapsed was due to economic circumstances, his mental health issues themselves, or both.

51.

The standard of care for medical intake requires that the clinician obtain collateral information, but Defendants chose not to take this crucial step. In addition, upon information and belief, because Mr. Gahr was diagnosed with bipolar disorder, any reasonable medical professional exercising his or her professional judgment would obtain and review past health records, and prescribe lithium as first-line treatment. Rather than taking any of these steps, Defendants simply assigned Mr. Gahr to be housed in housing unit C-7.

52.

Mr. Gahr was housed in the new inmate area, housing unit C-7. Due to COVID protocols inmates were kept confined to their cells for 23 hours a day and allowed out 1 hour per day.  Solitary confinement is a well-known and obvious suicide risk factor. *See, e.g., Braggs v. Dunn, 257 F. Supp. 3d 1171, 1235 (M.D. Ala. 2017)*.  While Mr. Gahr was not under administratively imposed solitary confinement, the circumstances he was incarcerated under were substantially similar or nearly identical to it, being on a 23-1 schedule. Mr. Gahr was incarcerated in cell C-7-204.

///

Page 17 – **FIRST AMENDED COMPLAINT**

53.

Oregon Jail Standards (OJS) and Marion County's jail policy do not require that a detainee be psychologically cleared prior to isolation housing, as required by national standards. No additional screening or assessment was done for Mr. Gahr as a result of being housed in isolated conditions. National standards also require that inmates living in segregation or solitary confinement (which is defined by the National Commission on Correctional Health Care as an inmate having contact with staff or other inmates as few as three times a day) be monitored by health professional daily. Mr. Gahr was not monitored by a health professional except when making specific appointments.

54.

On May 27, 2020 Mr. Gahr had a visit with the jail dentist and did not receive any new prescriptions.

55.

Upon information and belief Mr. Gahr had no other meetings with jail medical staff other than those noted elsewhere in this complaint. This fell below the standard of care for inmate health care. Any reasonable medical professional or jail administrator would have noted Mr. Gahr's prior medical and mental health history, performed an additional assessment and examination, and prescribed lithium or other appropriate medication for Mr. Gahr's bipolar disorder.

56.

Upon information and belief OJS and Marion County Jail do not have a specific standard regarding welfare checks, second opinions about mental health, or any other fail-safe system regarding AIC mental health.

57.

On June 16, 2020 Mr. Gahr was last seen alive at 5:30 p.m. Deputy Sterling

Page 18 – **FIRST AMENDED COMPLAINT**

performed a welfare check at 5:25 p.m., and looked into Mr. Gahr's cell at 5:27 p.m. At 5:30 p.m. Mr. Gahr was observed exiting his cell to receive his dinner tray and then returning to his cell. At 5:46 p.m. Deputy Lipscomb and Deputy Tilson arrived on duty for a shift-change. Deputy Lipscomb walked past Mr. Gahr's cell twice around this time but did not look into the cell. At 5:58 p.m. Deputy Lipscomb began a head count of the inmates. At 6:01 p.m. Deputy Lipscomb discovered Mr. Gahr in his cell and called for backup. Deputy Tilson arrived and both deputies entered the cell. They found Mr. Gahr unresponsive with his thermal shirt wrapped around his neck and tied to the top bunk. The deputies cut the thermal with scissors that had been brought by a responding deputy and then removed it from his neck and began administering CPR. At 6:06 p.m. Nurses France and Nguyen arrived and administered oxygen and place an automated external defibrillator (AED). At 6:14 p.m. EMS arrived and took over emergent medical care of Mr. Gahr. Mr. Gahr departed the jail at approximately 6:44 p.m.

58.

Mr. Gahr passed away at Salem Health Hospital on June 17, 2020 at approximately 4:27 p.m.

59.

The Marion County Medical Examiner conducted an autopsy as required by law. The autopsy indicated his suspected cause of death was asphyxia and anoxic brain injury secondary to ligature hanging, with suicide as the manner of death.

60.

The death by suicide of Mr. Gahr was tragic and could have been prevented by standard approaches to medical and mental health care management.

61.

The policies, established procedures, and protocols in place at the Jail put Mr. Gahr

and all other similarly situated patients at an increased risk of serious harm and death.

62.

That these policies, established procedures, and protocols would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

63.

The County also failed to adequately train its employees, resulting in a condition that put Mr. Gahr and all other similarly situated patients at an increased risk of serious harm and death.

64.

That this failure to train would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

65.

The scope of a medical or mental health provider's duty to a patient is determined by the standard of care. Here, the medical and mental health staff was indifferent to the medical needs of Mr. Gahr, and that indifference was indicative of a pattern of falling below the standard of care in dealing with the needs of patients.

66.

Mr. Gahr would have not died at the time and in the manner that he did, had jail medical and mental health staff not been indifferent to Mr. Gahr's needs. Jail medical and mental health staff's indifference to Mr. Gahr's serious medical and mental health needs was ratified by those Defendants in supervisory and policymaking roles.

67.

When deputies responded, they did not have a knife or rescue tool to cut away the

Page 20 – **FIRST AMENDED COMPLAINT**

ligature. Because they did not have any rescue tool, they were unable to immediately

remove the ligature, and instead had to wait while another deputy brought scissors.

68.

Hanging is the most common form of successful suicide in jails. This is well-

known and was known by the County and its policymakers and supervisors.

69.

A reasonable and prudent jail operator or administrator would make available for

their agents and subordinates relatively inexpensive rescue tools.

70.

Defendants' failure to possess these types of rescue tools and to make them

available to its agents and subordinates constitutes negligence and deliberate indifference.

71.

Possession of rescue tools would have prevented Mr. Gahr's extended period of

hanging and saved his life.

72.

Mr. Gahr's death by suicide and Defendants' failure to adequately diagnose, treat

and supervise him caused his death.


**<u>DAMAGES</u>**

73.

Mr. Gahr was 52 years old at the time of his death. He left behind one daughter,

Gena Gahr, and in so doing rendered her an orphan.

74.

The aforesaid acts and omissions of Defendants deprived Mr. Gahr of his right to

be free from cruel and punishment and to due process of law as guaranteed by the

Page 21 – **FIRST AMENDED COMPLAINT**

Fourteenth Amendment of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to his death; directly caused and/or directly contributed to his daughter suffering loss of services, companionship, comfort, instruction, guidance, counsel, training, and support; and directly caused and/or directly contributed to his daughter suffering pecuniary losses, including but not limited to medical and funeral expenses.

75.

Upon information and belief, prior to death, Mr. Gahr suffered extreme physical and mental pain, terror, despondency, anxiety, suffering, and emotional distress.

76.

Mr. Gahr's death was unnecessary and could have been prevented via provision of the basic medical care and treatment.

77.

As a result and consequence of Defendants' acts and omissions, Plaintiff has incurred or will incur in the future economic damages. Specifically, Gena Gahr has incurred $5,000 in cremation expenses, urn to hold ashes, funeral and burial expenses, and therapy costs related to trauma from Mr. Gahr's death. Gena Gahr expects to continue to incur costs, including therapy costs related to trauma from Mr. Gahr's death for the foreseeable future. Plaintiff specifically reserves the right to amend the alleged economic damages to bring them current at the time of trial.

78.

As a further result and consequence of Defendants' acts and omissions, Plaintiff is entitled to recover for the decedent's disability, physical pain, anguish, misery, torment,

distress, confusion, and lack of enjoyment of life, all to the non-economic damage in an amount to be determined at trial.

## FIRST CLAIM FOR RELIEF

### Negligence – Wrongful Death

79.

Plaintiff realleges and incorporates herein as though set forth in full paragraphs 1 through 78, above.

80.

Defendants had a duty to care for detainees and provide reasonable safety and medical care, including psychiatric care.

81.

This duty extends to foreseeable self-inflicted harms and includes protecting detainees against suicide.

82.

This duty exists because detainees, by virtue of their detention, are unable to obtain medical and psychiatric care for themselves.

83.

Defendants breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

84.

Defendants breached that duty, and were negligent, when they failed to adequately treat Mr. Gahr's medical and psychiatric needs. Indeed, because Mr. Gahr's medical and psychiatric needs were entirely ignored, Defendants were grossly negligent.

Page 23 – **FIRST AMENDED COMPLAINT**

85.

Defendants breached that duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical and psychiatric care and treatment to detainees.

86.

Defendants breached that duty, and were negligent, when they failed to ensure adequate and proper medical or mental health staffing at the Jail.

87.

Defendants breached that duty, and were negligent, when they failed to ensure that Mr. Gahr was properly supervised and/or that cell checks were conducted in a safe, timely, and consistent manner.

88.

Defendants breached that duty, and were negligent, when they failed to ensure that Mr. Gahr received adequate medication.

89.

Defendants breached that duty, and were negligent, when they ignored notification of Mr. Gahr's serious mental health conditions and/or suicidality.

90.

Defendants breached that duty, and were negligent, when they failed to properly assess and treat Mr. Gahr prior to his death.

91.

Defendants breached that duty, and were negligent, when they failed to maintain a proper suicide prevention program.

///

///

Page 24 – **FIRST AMENDED COMPLAINT**

92.

As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Mr. Gahr's mental health deteriorated and he committed suicide.

93.

Mr. Gahr suffered pre-death pain, suffering, despondency, and terror.

94.

As a direct and proximate result of the actions and inactions of Defendants, and each of them, Mr. Gahr endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of suicide. Mr. Gahr's daughter has been denied his love, society and companionship. As a direct and proximate result of the actions and inactions of Defendants, Mr. Gahr's daughter has suffered the loss of familial association with Mr. Gahr.  Gena Gahr has suffered and will continue to suffer extreme grief and harm due to mental and emotional distress as a result of Mr. Gahr's wrongful death. Gena Gahr has incurred medical expenses and funeral expenses and suffered economic damages as alleged in paragraph 77. Plaintiff is further entitled to non-economic damages as alleged in paragraph 78.

95.

Notice pursuant to the Oregon Tort Claims Act was given to Defendant Marion County within the time prescribed by law.


## SECOND CLAIM FOR RELIEF

### Civil Rights Claim – 42 USC 1983 – 8th and/or 14th Amendments

96.

Plaintiff realleges and incorporates herein as though set forth in full paragraphs 1

through 95, above.

97.

The acts and failure to act described above were done under color of law and are in violation of 42 USC 1983, depriving Mr. Gahr of his civil rights.

98.

At the time Mr. Gahr was incarcerated by the County, it was clearly established in law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

99.

Being subjected to unnecessary physical and mental pain and suffering is not part of the penalty that criminal offenders pay for their offenses.  As a result, jail officials and Counties are liable if they know that an inmate or inmates face a substantial risk of serious harm and callously disregard that risk by failing to take reasonable measures to abate it.

100.

Here, Defendants knew that Mr. Gahr faced a substantial risk of suicide, yet callously disregarded that risk by failing to take reasonable measures to abate it.

101.

Here, Defendants knew that Mr. Gahr suffered from physical and mental illness, yet callously disregarded these afflictions by failing to take reasonable measures to abate them.

102.

Defendants were deliberately indifferent to Mr. Gahr's rights under the Fourteenth Amendment of the U.S. Constitution in one or more of the following ways:

    a.  In failing to ensure that Mr. Gahr was seen by a qualified medical professional;

    b.  In failing to ensure that Mr. Gahr was seen by a qualified mental health

professional;

c.  In failing to evaluate Mr. Gahr for changes in the symptomology of his bipolar disorder;

d.  In failing to routinely evaluate Mr. Gahr for changes or deterioration in his mental health given his housing in conditions similar to solitary confinement;

e.  In failing to evaluate Mr. Gahr for his medication related needs given his prior medication history related to bipolar disorder;

f.  In failing to adequately review Mr. Gahr's medical history;

g.  In failing to properly treat Mr. Gahr's serious medical and mental health needs;

h.  In failing to ensure that Marion County Jail had proper medical staffing;

i.  In failing to ensure that Marion County Jail had proper mental health staffing; and

j.  In failing to ensure that Marion County Jail had a sufficient suicide prevention program.

103.

As a direct result of the actions and inactions of Defendants as set forth in this complaint above, Matthew Gahr endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of suicide. Mr. Gahr's daughter has been denied his love, society and companionship. Gena Gahr incurred medical expenses and funeral expenses and suffered economic damages as alleged in paragraph 77. Plaintiff is further entitled to non-economic damages as alleged in paragraph 78.

104.

Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC 1988.

Page 27 – **FIRST AMENDED COMPLAINT**

## THIRD CLAIM FOR RELIEF

### Civil Rights Claim – 42 USC 1983 – *Monell* Claims

105.

Plaintiff realleges and incorporates herein as though set forth in full paragraphs 1 through 103, above.

106.

At all material times, Defendants were aware of the substantial risk of suicide committed by jail inmates, as evidenced by the jail's Policy 3110 pertaining to AIC Suicides.

107.

The moving forces that resulted in the deprivation of the Fourteenth Amendment rights of Mr. Gahr were the following policies, customs or practices of Marion County:

    a.   A policy, custom or practice of failing to adequately screen mental health at intake;

    b.   A policy, custom or practice of failing to adequately review AIC medical history;

    c.   A policy, custom or practice of failing to adequately examine AIC mental health after intake;

    d.   A policy, custom or practice of failing to have people with serious mental health needs seen by a qualified mental health professional;

    e.   A policy, custom or practice of failing to provide sufficient mental health coverage;

    f.   A policy, custom or practice of failing to provide a sufficient suicide prevention program; and

    g.   A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical and mental health services for jail

Page 28 – **FIRST AMENDED COMPLAINT**

inmates.

108.

The policies of Defendant Marion County posed a substantial risk of causing substantial harm to Marion County inmates, and Marion County was aware of the risk.

109.

As a direct result of the policies, customs or practices of Marion County, Mr. Gahr endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of suicide. Mr. Gahr's daughter has been denied his love, society and companionship. Gena Gahr incurred medical expenses and funeral expenses and suffered economic damages as alleged in paragraph 77. Plaintiff is further entitled to non-economic damages as alleged in paragraph 78.

110.

The actions of Defendant Marion County were recklessly indifferent to the civil rights of Matthew Gahr, and callously disregarded Matthew Gahr's physical safety.

111.

Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC 1988.


**<u>FOURTH CLAIM FOR RELIEF</u>**

**Americans With Disabilities Act ("ADA") and ORS 659A.103 *et seq***

112.

Plaintiff realleges and incorporates herein as though set forth in full paragraphs 1 through 110, above.

113.

Marion County is a public entity within the meaning of Title II of the ADA, and

Page 29 – **FIRST AMENDED COMPLAINT**

provides programs, services or activities to the general public in the form of health care within the jail.

114.

The Defendants with whom Marion County contracted to provide mental health services within the jail were agents of Marion County, as a public entity and provided programs, services or activities to the general public in the form of health care within the jail.

115.

At all times relevant, Mr. Gahr was a qualified individual within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of services, programs, or activities of the Marion County Jail. Specifically, Mr. Gahr suffered from mental health conditions including bipolar disorder that "substantially limits one or more major life activities," including but not limited to the general activities such as "sleeping… concentrating, thinking, communicating, and working." 42 USC 12102.

116.

Defendants Marion County and its agents provide housing, medical and mental health treatment, and work and educational programs to inmates, which comprise programs and services for Title II purposes.

117.

Under the ADA, Marion County is required to accommodate disabled prisoners, including providing prisoners with necessary medications, providing the same level of medical care to disabled prisoners, and allowing prisoners to participate in the same programs and services as those prisoners who are not disabled.

118.

ORS 659A.103 *et seq* is the Oregon state equivalent to the ADA and is substantially

similar or the same.

119.

Marion County was deliberately indifferent in failing to provide Mr. Gahr with reasonable accommodations and other services related to his disabilities, and denied him the rights and benefits accorded to other inmates, solely by reason of his disabilities in violation of the ADA and in the following ways:

a.  Marion County failed to provide Mr. Gahr with his prescription medication that he disclosed to them as needing upon his intake, resulting in his suicide.

b.  The ADA requires that mentally disabled prisoners have access to adequate medical and mental health care. Mr. Gahr was denied adequate mental health care. Specifically, Marion County jail staff failed to treat Mr. Gahr's mental health needs, resulting in his suicide.

c.  The Marion County jail staff failed to enforce appropriate policies and procedures to ensure the provision of necessary accommodations, modifications and/or programs and services to inmates with disabilities.

120.

As a direct result of Defendants' above wrongful acts, Defendants discriminated against Mr. Gahr on the basis of his disability in violation of the ADA and Oregon law, causing him to commit suicide.

121.

Accordingly, Plaintiff is entitled to non-economic damages in an amount to be determined at trial against Defendants for the violations of 42 USC 12101 *et seq.,* ORS 659A.103 *et seq*, and for Plaintiff's attorney fees and costs pursuant to ORS 659A.885(d), 29 USC 794a(b), 42 USC 12205, and 42 USC 1988.

Page 31 – **FIRST AMENDED COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1.    For economic damages in amount to be determined at trial;

2.    For non-economic damages in an amount to be determined at trial;

3.    For attorney fees and costs pursuant to 42 USC 1988, as alleged in Plaintiff's three Claims for Relief (Civil Rights Violation – 42 USC 1983) (ADA Violation – 42 USC 120101 and ORS 659A.885(d));

4.    For costs and disbursements incurred herein; and

5.    For such other relief as the Court deems just and equitable.


Dated this 27th day of March, 2023.

NEAL WEINGART –
ATTORNEY AT LAW, LLC.

*s/ Neal Weingart*
Neal Weingart (he/him) OSB 066551
neal@nealweingartlaw.com
Trial Attorney: Neal Weingart


PICKETT DUMMIGAN WEINGART LLP
Christopher A. Larsen (he/him), OSB 910679
chris@pdw.legal
Of Attorneys for Plaintiff, Trial Attorney

Page 32 – **FIRST AMENDED COMPLAINT**

## CERTIFICATE OF SERVICE

I hereby certify that on the date shown below, I served a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** on:

Jane E. Vetto, OSB# 914564
Joseph Miller, OSB# 160851
Marion County Legal Counsel
PO Box 14500
Salem, OR 97309
Phone: 503-588-5220
Fax:    503-373-4367
Email: jvetto@co.marion.or.us
          jcmiller@co.marion.or.us

*Of Attorneys for Defendants Marion County, Joe Kast, Tad Larson, Bobbie France, Bryan Nguyen, Donna Millan and Matthew Lipscomb*

☐　　　by first class mail, postage prepaid.

☒　　　by email.

☐　　　by facsimile transmission.

DATED this 27th day of March, 2023.

*Neal Weingart*
_____
Neal Weingart – OSB #066551
Attorney at Law
Attorney for Plaintiff

TRIAL ATTORNEY: Neal Weingart, OSB# 066551

Page 33 – **FIRST AMENDED COMPLAINT**