UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

GENA GAHR, personal representative for the
Estate of MATTHEW GAHR, deceased,

      Plaintiff,

v.

MARION COUNTY, an Oregon County; JOE
KAST, an individual; TAD LARSON, an
individual; BRYAN NGUYEN, an individual;
DONNA MILLAN, an individual; SARAH
LAPHAM, an individual; JASON TILLSON,
an individual; and LANCE LOBERG, M.D.,
an individual,

      Defendants.

Case No. 6:22-cv-01188-MTK

**OPINION AND
ORDER**

**KASUBHAI,** United States District Judge:

      Plaintiff Gena Gahr ("Plaintiff"), personal representative of the Estate of and daughter of

the deceased Matthew Gahr, brings this civil rights action arising out of Mr. Gahr's suicide while

in custody at Marion County Jail (the "Jail"). Plaintiff alleges constitutional violations under 42

U.S.C. § 1983, negligence and wrongful death, and state and federal disability discrimination

claims against Marion County, Joe Kast ("Sheriff Kast"), Tad Larson ("Commander Larson"),

Bryan Nguyen ("Nurse Nguyen"), Health Services Supervisory Sarah Lapham ("HSS

Lapham"),[1] Jason Tilson ("Deputy Tilson"), Family Nurse Practitioner Donna Millan ("FNP Millan) and Lance Loberg ("Dr. Loberg") (collectively, "Defendants"). Defendants move for summary judgment. County Defs.' Mot. Summ. J., ECF No. 76; Defs.' Loberg and Millan's Mot. Summ. J., ECF No. 79. For the reasons explained below, Defendants' Motions are GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff's claims arise out of Defendants' alleged failure to treat Decedent Matthew Gahr's bipolar disorder. Mr. Gahr was lodged at the Jail on April 28, 2020. Walterman Decl., Ex. 1 at 1, ECF No. 77. While in the Jail's custody, Mr. Gahr died by suicide on June 17, 2020. Weingart Decl., ECF No. 92-13.

### I.    Mr. Gahr's Intake and Screening

Mr. Gahr was booked at the Marion County Jail approximately 43 times between 1998 and 2020. Walterman Decl., Ex. 1 at 1–3, ECF No. 77. Through previous intake forms and medical request forms, the Jail's records indicated in multiple places that Mr. Gahr had bipolar disorder and was prescribed lithium to treat the disorder. *See* Weingart Decl., ECF No. 92-1. Mr. Gahr received his lithium prescription during numerous past lodgings at the Jail. *See* Weingart Decl., ECF No. 92-2. The Jail also had documents on file detailing Mr. Gahr's mental health history, including documents that showed he was hospitalized for suicidal ideation in 2007 while he was not taking lithium. Waters Decl. ¶ 16, ECF No. 90; Walterman Decl., Ex. 2 at 1, ECF No. 77.

---

[1] Sarah Lapham changed her name to Sarah Wood at some point between the incident and discovery. The parties do not dispute that both names refer to the same person and the Court refers to her as Sarah Lapham, the name used when Plaintiff filed this lawsuit.

### A.    Deputy Tilson

Deputy Tilson was the senior deputy at the Jail who conducted Mr. Gahr's inmate health screening during Mr. Gahr's lodging. Walterman Decl., Ex. 5 at 1:25, ECF No. 77; Walterman Decl., Ex. 6 at 2, ECF No. 77. During intake, Deputy Tilson asked Mr. Gahr if he had any current medications, had any thoughts of hurting or killing himself, or had been treated for a mental condition. Walterman Decl. Ex. 6 at 1–2, ECF No. 77. Deputy Tilson recorded that Mr. Gahr answered "No" to being on any current medications, but Deputy Tilson also wrote "Lithium" in the notes section for that question. *Id.* at 1. Deputy Tilson recorded that Mr. Gahr was not thinking of hurting or killing himself but that he had been treated for a mental condition at Kaiser Permanente within the last three months. *Id.* at 2.

Policy 3110 of the Marion County Sheriff's Office details how the Jail's staff should identify and care for adults in custody ("AICs") experiencing suicidal behavior. Weingart Decl., Ex. 15 ("MCSO Policy 3110") ECF No. 92-10. During intake, employees must observe all AICs "for depressed and/or suicidal behavior, or the possibility of extreme situational stressors that warrant immediate intervention." *Id.* at ¶ 1. Employees are to use "observation and verbal skills to recognize situational and behavioral risk factors that warrant immediate intervention and reporting." *Id.* at ¶ 2. If an employee makes such a finding, they must report it to the Jail's Health Services or Mental Health Services staff. *Id.* at ¶ 3.

On April 28, 2020, Deputy Tilson completed the intake form and lodged Mr. Gahr at the Jail. He did not flag Mr. Gahr as someone warranting immediate medical intervention and reporting.

### B.    Nurse Ngyuen

On May 1, 2020, Nurse Nguyen reviewed Mr. Gahr's intake form and the inmate medical records from Mr. Gahr's most recent previous lodging. Weingart Decl., Ex. 9 ("Nguyen Dep.")

47:2–5, 46:20–24, ECF No. 92-4. He did not review any of Mr. Ghar's other medical records in the Jail's possession. *Id.* at 47:11–17. According to Nurse Nguyen, only urgent medical issues trigger an in person follow up with an AIC. *Id.* at 16:7–20. Nurse Nguyen did not meet with Mr. Gahr and routed his review of Mr. Gahr's intake form and past records to Health Services for a prescribed medication review. Walterman Decl., Ex. 8 at 26:13–21, ECF No. 77.

Policy 3710 of the Marion County Sheriff's Office provides the Jail's procedure for initiating health care for AICs based on their intake assessments. Weingart Decl. Ex. 8 ("MCSO Policy 3710"), ¶ 25–32, ECF 92-3. All initial intake forms are reviewed by nursing employees. *Id.* at ¶ 27. If the intake form indicates that an AIC has a medical problem, "[t]he nurse is responsible to contact the AIC, and obtain pertinent information for diagnosis and treatment. . . . Follow-up screening will be completed in a reasonable time period, not to exceed 48 hours." Ex. *Id.* at ¶ 29. Policy 3715 of the Marion County Sheriff's Office provides that the follow-up screening will include: "Physical assessment if indicated," "[r]equest of verification of medical problems per consultation with prescribing physician of record or per AIC's statements of where condition was diagnosed," and "[r]eview of chart documentation during previous incarceration(s) for chronic medical problems and treatment." Weingart Decl. Ex. 16 ("MCSO Policy 3715") ¶ 7, ECF 92-11.

Nurse Nguyen stated in deposition that the type of medication an AIC was on is what would trigger a mental health review by a doctor, psychiatric nurse practitioner, or someone else on the Mental Health Services staff. Nguyen Dep. at 25:9–14. He agreed that a lithium prescription would trigger such a review. *Id.* at 25:15–17. He also agreed that the lithium notation on Mr. Gahr's intake form "should have triggered [him] to alert mental health

practitioners that Mr. Gahr should have been evaluated for mental health issues." *Id.* at 25:18–24. Nurse Nguyen did not refer Mr. Gahr to Mental Health Services for an evaluation.

### C.　　Family Nurse Practitioner Millan

FNP Millan, reviewed the materials forwarded by Nurse Nguyen. The Jail had also obtained a release of information from Mr. Gahr's pharmacy regarding his medication history, which FNP Millan reviewed as well. Weingart Decl., Ex. 11 ("Millan Dep.") 51:11–15, ECF No. 92-6.

The Jail's Standard Nursing Protocol on starting current medications provides that upon lodging, any inmate with a medication filled within the last 30 days may continue receiving that medication. Weingart Decl., Ex. 14 ("Standard Nursing Protocol — Medications"), ECF 92-9. Mr. Gahr's medication history indicated that his most recent prescription for lithium was a 30-day supply, filled on December 16, 2019. Weingart Decl., Ex. 12 at 3. FNP Millan completed her medication review and because Mr. Gahr' lithium prescription was more than 30 days old, she did not order a new lithium prescription for Mr. Gahr. Walterman Decl., Ex. 9, ECF No. 77; Weingart Decl., Ex. 12 at 3, ECF No. 92-7.

The Standard Nursing Protocol on starting current medications also requires the nurse to "[r]efer all mental health medications to" the Jail's psychiatric mental health nurse practitioner, David Wear.[2] Standard Nursing Protocol — Medications, ECF No. 92-9. The Jail's Standard Nursing Protocol on bipolar disorder explains that AICs with bipolar disorder are prone to depressive episode which "can be very severe and are a risk for suicide" and that "[t]hese clients

---

[2] Former defendant David Wear was the psychiatric mental health nurse practitioner (PMHNP) for the Jail at the relevant time. Wear Decl. at 2, ECF No. 78-1. Mr. Wear was the head of the Jail's Mental Health Services. In response to Mr. Wear's Motion for Summary Judgment, Plaintiff filed a Fed. R. Civ. P. 41(a)(1)(A)(ii) Stipulated Dismissal of all claims against Mr. Wear with prejudice. Stipulated Notice of Dismissal of Party David Wear, ECF No. 83.

are more highly at risk for suicidal attempts." Weingart Decl., Ex. 17 ("Standard Nursing

Protocol — Bipolar") ECF No. 92-12. The Jail's Standard Nursing Protocol on bipolar disorder

also also instructs:

> If signs/symptoms are severe, patient is unmanageable, if there are signs of significant depression, potential for self harm, potential for suicide, or potential for patient harming others, house in C4 on S/W.
>
> Refer patient [to] the QMHP [(Qualified Mental Health Professionals)] list for evaluation.

*Id.*

FNP Millan knew that lithium is used to treat bipolar disorder. Millan Dep. at 2:22–25.

Yet FNP Millan did not refer Mr. Gahr or his lithium prescription to anyone for additional

review. *See* Walterman Decl., Ex. 9, ECF No. 77.

## II.     Mr. Gahr's Last Stay at Marion County Jail

Mr. Gahr was lodged at the Jail for 7 weeks before his suicide. During previous lodgings,

Mr. Gahr had requested and received a lithium prescription for treating his bipolar disorder.

Walterman Decl., Ex. 3, ECF No. 77. Other than the "lithium" notation on Mr. Gahr's intake

form, there is no evidence that Mr. Gahr requested medication or treatment for his bipolar

disorder during this lodging. On May 26, 2020, Mr. Gahr submitted a medical request form to

the staff for a toothache, which was treated. Walterman Decl., Ex. 10 at 1, ECF No. 77. Prior to

his suicide, the record does not contain evidence that any Defendant observed Mr. Gahr

exhibiting suicidal behavior.

On June 16, 2020, a deputy found Mr. Gahr hanging in his cell. Walterman Decl., Ex. 9,

ECF No. 77. He was cut down and paramedics arrived to transport him to a hospital. *Id.* He died

at Salem Hospital on June 17, 2020. Weingart Decl., ECF No. 92-13.

Plaintiff's expert, Dr. Waters, opined

> Mr. Gahr had an extensive history of treatment for bipolar disorder. His records evidenced a pattern of experiencing acute mood episodes when untreated, yet the fact that he did not have an active prescription for lithium (i.e., within 30 days) or acute symptoms was repeatedly cited as evidence to not refer him for further evaluation. Ultimately, the failure to adequately manage the deceased's known serious mental health condition, including the lack of appropriate interventions aligned with the evidence-base and standards of care, more likely than not contributed to his deteriorating mental state and ultimate death by suicide. As a clinical psychologist with extensive experience in correctional mental healthcare and suicide prevention, it is my professional opinion that these deficiencies in care more likely than not exacerbated the deceased's psychiatric condition, culminating in his death by suicide.

Waters Decl. ¶ 26.

## III.    The Jail's Supervisors

### A.    Dr. Loberg

The Jail hired Dr. Loberg as an independent contractor to provide supervising physician services and medical oversight including review of its medical standing orders, policies, and procedures, and making recommendations to the Jail's administration. Greenberg Decl. Ex. 9 at 11-14 ("Contract for Services"), ECF No. 81. The Jail's nurses practice under Dr. Loberg's licensure. Weingart Decl., Ex. 31 ("Loberg Dep.") 12:16-23, ECF No. 92-26. Dr. Loberg was not present when Nurse Nguyen forwarded the intake materials for a medication review and was unaware of Mr. Gahr's presence at the Jail until after Mr. Gahr's death. FNP Millan was designated in Dr. Loberg's contract with the Jail to help provide physician services when Dr. Loberg was out. Millan Dep. at 24:25, 25:1–3.

### B.    Health Services Supervisor Lapham

HSS Lapham has supervised the Jail's nursing staff since 2006. Weingart Decl., Ex. 26 ("Lapham Dep.") 36:3–8, ECF No. 92-21. During Mr. Gahr's lodging, HSS Lapham supervised the Health Services department including the Jail's nursing staff. *Id.* In deposition, HSS Lapham stated that she was concerned about the mental wellbeing of every person lodged at the Jail and

noted that "suicide is the highest leading cause of death in jails." Lapham Dep. at 37:17. HSS

Lapham was not trained in mental health conditions and does not provide formal training to her

medical staff. *Id.* at 39:7-12. When asked whether there should be formal training to the medical

staff in relation to mental health conditions, HSS Lapham responded "[t]here could be a lot more

training in all areas, in my opinion." *Id.* at 43:14-15. As HSS Lapham explained in deposition:

> [**HSS Lapham**] I would like training in all areas to come to my staff, not just mental health. I would like more medical training. Any kind of training, I would be open and be glad to have that for our staff.
>
> [**Plaintiff's Counsel**] But my question here is whose duty do you think it would be to provide such training related to mental health issues to your staff?
>
> [**HSS Lapham**] Whose current duty?
>
> [**Plaintiff's Counsel**] Yeah.
>
> [**HSS Lapham**] I don't know if it's a duty for anybody at this time.
>
> [**Plaintiff's Counsel**] In your mind, is anyone contracted to provide mental health training to the nursing staff?
>
> [**HSS Lapham**] No.
>
> [**Plaintiff's Counsel**] In your mind, are there any employees who are tasked with providing mental health training to the nursing staff?
>
> [**HSS Lapham**] No.

*Id.* at 44:8-25.

### C.    Sheriff Kast and Commander Larson

Sheriff Kast is the Sheriff of Marion County. Weingart Decl., Ex. 25 at 14:2–6, ECF No.

92-20. Commander Larson is the Jail's Commander. Weingart Decl., Ex. 21 ("Larson Dep.") at

9:16–18, ECF No. 92-16. Sheriff Kast and Commander Larson promulgated the Jail's policies

that were in place during Mr. Gahr's last lodging, including the policies relevant to Mr. Gahr's

medical screening, supervision, and care. MCSO Policy 3110 at 5; MCSO Policy 3710 at 6;

MCSO Policy 3715 at 2.

IV.    **Training on Mental Health at the Jail**

In addition to going through a field manual specific to Marion County, the Jail's deputies are required to complete the Oregon Department of Public Safety Standards and Training. Walterman Decl., Ex. 12 at 38:12–17, 28:13–15, ECF No.77. This training includes a section on "Mental Health in Jails," describing how to identify, interact with, and manage AICs with mental illness, including those with bipolar disorder. *See* Weingart Decl., Ex. 28 ("CorrectionsOne Academy"), ECF No. 92-23. The Jail's nurses, however, only go through the field manual specific to Marion County. Walterman Decl., Ex. 12 at 38:12–17, 28:9–15, ECF No.77. The Jail does not provide the nurses with training on mental health conditions. Lapham Dep. 39:4–12.

## STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved

against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

## DISCUSSION

### I.    Procedural Arguments by Dr. Loberg and FNP Millan

Dr. Loberg and FNP Millan assert several procedural arguments, which the Court rejects.

#### A.    The Oregon Tort Claims Act ("OTCA") — Substitution Provision

Dr. Loberg and FNP Millan argue that the substitution provision of the OTCA requires substituting Marion County for the individual Defendants. Under Or. Rev. Stat. ("ORS") § 30.265(3), "[i]f an action is filed against an . . . agent of a public body, and the plaintiff alleges damages in an amount equal to or less than the [statutory cap], the court upon motion shall substitute the public body as the defendant." Plaintiffs in federal court are not required to plead a specific amount in damages. Fed. R. Civ. P. 8(a). Here, Plaintiff does not allege a specific amount in damages. The substitution provision is inapplicable because Plaintiff did not allege damages equal to or less than the statutory cap.

#### B.    OTCA — Tort Claim Notice

Dr. Loberg and FNP Millan argue they were not provided timely tort claim notice on Plaintiff's negligence claim. Plaintiff responds that notice to Marion County was sufficient to satisfy the OTCA's tort claim notice requirement.

Under ORS 30.275, a plaintiff bringing a wrongful death claim under the OTCA must provide notice of an intent to bring suit within one year of the death. If the claim is against a local public body or its agent, this notice can be given to an attorney designated by the governing body as its general counsel. ORS 30.275(5)(b). The purpose of the notice requirement of the OTCA "is to give the public body timely notice of the tort and allow its officers an opportunity

to investigate the matters promptly and ascertain all the necessary facts." *Urb. Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 41 (1976).

Plaintiff sent a tort claim notice to Marion County's legal counsel on June 3, 2021, within one year of Mr. Gahr's death. Weingart Decl., ECF No. 92. Dr. Loberg and FNP Millan do not dispute that they were acting as agents of Marion County at all relevant times. Plaintiff's tort claim notice to Marion County's legal counsel satisfies the OTCA's tort claim notice requirement.

### C.    Statute of Limitations

The parties agree that the statute of limitations on Plaintiff's negligence claim is two years and that the statute of limitation on Plaintiff's § 1983 claim is three years. Dr. Loberg argues that these claims are untimely because they began to accrue when Mr. Gahr died on June 17, 2020 but Plaintiff did not serve Dr. Loberg until October 1, 2023. Plaintiff responds that the claims against Dr. Loberg are timely because they did not begin to accrue until Plaintiff discovered Dr. Loberg's identity, on November 18, 2022.

Under the so-called discovery rule, the statute of limitations does not begin to run until a plaintiff discovers their injury "and the identity of the party responsible for that injury." *Doe 1 v. Lake Oswego Sch. Dist.*, 353 Or. 321, 327 (2013) (quoting *Adams v. Oregon State Police*, 289 Or. 233, 239 (1980)). The evidence establishes that Plaintiff tried but was unable to discover Dr. Loberg's identity until Marion County responded to Plaintiff's first request for production on November 18, 2022. ECF No. 92-35. Plaintiff filed her Second Amended Complaint, adding Dr. Loberg as a defendant on September 27, 2023. Sec. Am. Compl. ECF No. 50. Plaintiff served Dr. Loberg with summons and the Second Amended Complaint on October 1, 2023. ECF No. 58. Dr. Loberg does not reply to Plaintiff's application of the discovery rule, which is well supported by additional evidence before the court. Dr. Loberg also did not make any procedural

arguments at Oral Argument. The evidence establishes that Plaintiff served Dr. Loberg within two years of Plaintiff's discovery of his identity, and the claims are timely.

## II.    Section 1983 Claim Against Individual Defendants

When prosecuting a civil rights claim under § 1983, a plaintiff must establish that (1) a person acting under color of law (2) deprived the plaintiff of a federal constitutional right. 42 U.S.C. § 1983; *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). Liability under § 1983 arises upon a showing of personal participation by each defendant. A supervisor is not liable for the constitutional violations of employees unless the supervisor "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Plaintiff must show that each named defendant, through their own individual actions, violated a constitutional right. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

To establish a claim for constitutionally inadequate medical care, a pretrial detainee must show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries."

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The third element is an objective standard under which "[a] defendant can be liable even if [they] did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in [their] circumstances would have drawn that inference." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022).

### A.    Substantial Risk of Serious Harm

For an inadequate medical care claim under § 1983, there must be a substantial risk of serious harm, established by "a serious medical need, such that a failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 739 (internal quotations and citation omitted). This is an objective standard which turns on whether the patient's condition is one which "a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* The Ninth Circuit has not decided whether the "serious medical need" depends on the symptoms the patient exhibits or on whether the ultimate cause of death is a "serious medical need." *Id.* at 739–40 (declining to address the appropriate scope of the inquiry because even under the narrower "symptom" scope of the inquiry, a reasonable doctor or patient would find such symptoms worthy of comment and treatment).

Here, Plaintiff has produced sufficient evidence from which a reasonable jury could conclude that Mr. Gahr had a "serious medical need" which posed a substantial risk of serious harm. Defendants argue that a reasonable doctor would not find Mr. Gahr's bipolar disorder important and worthy of treatment because he was not exhibiting acute symptoms, his treatment was intermittent, and he did not request lithium or other treatment during his final detention at the Jail. The Court is not aware of any precedent which excludes chronic and episodic illnesses such as bipolar disorder from the definition of a serious medical need. Dr. Loberg and FNP Millan argue that Mr. Gahr's intermittent treatment of his bipolar disorder indicates that it was not a serious medical need. This record also includes evidence of Mr. Gahr's intermittent treatment for his bipolar disorder and 43 bookings at the Jail. This evidence can show that Mr. Gahr's bipolar disorder was a serious medical need that was poorly managed. The Jail's Standard

Nursing Protocol on bipolar disorder describes in two places that people with bipolar disorder have a heightened risk for suicide. ECF No. 92-12. Specific to Mr. Gahr, the Jail possessed his medical records which showed that he was hospitalized for suicidal ideation in 2007 while he was not taking lithium. Walterman Decl., Ex. 2 at 1, ECF No. 77. A jury must decide whether Mr. Gahr's bipolar disorder constituted a serious medical need.

### B.    Deliberate Indifference

Having established that there is sufficient evidence from which a jury could find a serious medical need, the next question is whether there is evidence that each Defendant demonstrated deliberate indifference to that need. To establish deliberate indifference, a "plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of more than negligence but less than subjective intent—something akin to reckless disregard." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (citation and quotation marks omitted). The Court addresses each Defendant—or group of Defendants where appropriate—to evaluate whether a reasonable jury could find that they were deliberately indifferent.

### 1.    Deputy Tilson

During the health screening, Deputy Tilson reported that Mr. Gahr was not thinking of hurting or killing himself but that Mr. Gahr had been treated for a mental condition at Kaiser Permanente three months prior. Deputy Tilson assumed that reporting Mr. Gahr's recent mental health treatment would trigger the medical staff to inquire further about Mr. Gahr's mental health. Walterman Decl. Ex. 5 at 37:8-14, ECF No. 77. Deputy Tilson reported on the intake form Mr. Gahr as answering "No" to being on any current medications, but Deputy Tilson also wrote "Lithium" in the notes section for that question. Deputy Tilson could have taken it upon himself to refer Mr. Gahr to mental health services for an evaluation. Larson Dep. at 32:15-16. However, on this record his assumption that the medical staff's review of the intake form would

initiate a mental health evaluation of Mr. Gahr was not objectively unreasonable. Summary judgment is granted in favor of Deputy Tilson on Plaintiff's § 1983 claim.

### 2. Nurse Nguyen

Nurse Nguyen was the nurse who reviewed Mr. Gahr's intake form. The lithium notation and recent mental health treatment on Mr. Gahr's intake form indicated a serious medical problem. In accordance with MCSO policy, Nurse Nguyen, in accordance with MCSO policy, was obligated to contact Mr. Gahr for a follow-up screening to "obtain pertinent information for diagnosis and treatment" within 48 hours. MCSO Policy 3710 at ¶ 29. Nurse Nguyen was also obligated to review Mr. Gahr's medical records from "previous incarceration(s) for chronic medical problems and treatment." MCSO Policy 3715 at ¶ 7.

Nurse Nguyen agreed in deposition that the lithium notation on Mr. Gahr's intake form also should have triggered him to alert mental health practitioners that Mr. Gahr needed a mental health evaluation. Nguyen Dep. at 25:18–24. Nurse Nguyen chose not to refer Mr. Gahr to mental health services, he chose not to contact Mr. Gahr to obtain additional information about Mr. Gahr's bipolar disorder, and he chose not to review Mr. Gahr's medical records beyond his most recent lodging. Instead, Nurse Nguyen routed his purported review of Mr. Gahr's intake form and medical records to Health Services for a prescribed medication review.

A reasonable jury could conclude that Nurse Nguyen's actions were objectively unreasonable and that he was deliberately indifferent to Mr. Gahr's serious medical need.

### 3. FNP Millan

FNP Millan reviewed Mr. Gahr's intake form, medical records, and release of information from Mr. Gahr's pharmacy. FNP Millan argues that she did not act with deliberate indifference because when she "reviewed Mr. Gahr's chart, she only did so to review his current medications, not to make any determination related to his bipolar diagnosis." Reply to Mot. for

Summ. J. at 9, ECF No. 96. The Standard Nursing Protocol on medication requires "all mental health medications" to be referred to the Jail's psychiatric nurse. Standard Nursing Protocol — Medications, ECF No. 92-9. FNP Millan knew that Mr. Gahr had been prescribed lithium within the last six months and she knew that lithium is a mental health medication used to treat bipolar disorder. FNP Millan also knew that Mr. Gahr has been treated for a mental health condition within the last three months. Despite being aware of these facts, FNP Millan chose not to refer Mr. Gahr or his lithium prescription to Mental Health Services for additional review.

A reasonable jury could conclude that FNP Millan's conduct was objectively unreasonable and that she was deliberately indifferent to Mr. Gahr's serious medical need.

### C.  Supervisory Liability

Plaintiff alleges theories of supervisory liability against Dr. Loberg, HSS Lapham, Sheriff Kast, and Commander Larson ("Supervisory Defendants").

There is no vicarious liability under § 1983. However, supervisory officials may be liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). In other words, "[e]ven if a supervisory official is not directly involved in the allegedly unconstitutional conduct, a supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (internal quotation marks omitted). A mere allegation that policies and procedures authorized allegedly unconstitutional conduct is insufficient. *Id.* The plaintiff must show that the

supervisory defendant "was directly involved in the allegedly unconstitutional conduct or that he had knowledge of the constitutional deprivations and acquiesced in them." *Id.*

Plaintiff alleges that the Supervisory Defendants acted with deliberate indifference by adopting policies that violate state and national jail standards and by failing to provide adequate training. Plaintiff's expert's opinion, that the Jail's policies fall below state and national standards, is well reasoned and supported by the record. *See* Waters Decl. ¶¶ 14, 17-19, 22-26. Plaintiff's evidence may support a finding of negligence. However, as it relates to the § 1983 claims, it was Nurse Nguyen and FNP Millan's failure to follow the Jail's policies that caused the deprivation of Mr. Gahr's Constitutional rights. None of the Supervisory Defendants were directly involved in, had knowledge of, or acquiesced in Nurse Nguyen or FNP Millan's deliberate indifference to Mr. Gahr's serious medical need. The Supervisory Defendants' role in implementing the Jail's policies and training may give rise to *Monell* liability, discussed below. Summary judgment is granted in favor of Dr. Loberg, HSS Lapham, Sheriff Kast, and Commander Larson on Plaintiff's § 1983 claim.

### D.    Causation

To satisfy the causation element of a § 1983 claim, a plaintiff must prove that by not taking reasonable available measures to abate the plaintiff's substantial risk of suffering serious harm, "the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125. Plaintiff has submitted evidence in the form of expert opinion that Mr. Gahr would not have died had the Defendants adequately managed his known mental health condition. Waters Decl. ¶ 26, ECf No. 77.

Defendants emphasize that Mr. Gahr did not request mental health treatment and argue that there is no evidence that any Defendants witnessed Mr. Gahr exhibiting suicidal behavior during the 49 days prior to his death. Defendants' framing ignores a reasonably apparent purpose

of the Jail's intake protocols—identifying serious medical conditions that could go untreated if not flagged during a screening. Plaintiff provides evidence by way of expert opinion that Mr. Gahr's psychiatric condition was exacerbated by Defendants' failure to provide mental health treatment, culminating in his death by suicide. A jury must decide whether Mr. Gahr would have received treatment but-for Nurse Nguyen and FNP Millan's conduct, and whether these failings created the conditions that caused Mr. Gahr to take his own life.

### E.    Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Here, the Court has already found that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Mr. Gahr's right to constitutionally adequate medical care was violated. Thus, the first prong of the

analysis is satisfied, and the remaining question is whether the right violated was clearly established in light of the specific context of the case.

The Supreme Court has emphasized that the asserted right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (brackets and internal quotation marks omitted).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority[.]' " It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

*D.C. v. Wesby*, 583 U.S. 48 (2018) (citations omitted).

It is well established that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Sandoval*, 985 F.3d at 680. The medical condition presented need not be potentially life-threatening. *Id.* Rather, the determinative question is whether "every reasonable nurse in [that] position would have understood that his treatment of [the AIC], or lack thereof, was constitutionally inadequate." *Id.* (footnote omitted). State "'[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *cf. Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) ("The Supreme Court need not catalogue every way in

which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated Castro's right.").

Ninth Circuit "precedent confirms that a pretrial detainee's right to proper medical screening was clearly established" at the time of Mr. Gahr's detention. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021). Over twenty years ago, the Ninth Circuit in *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1194–96 (9th Cir. 2002) recognized "the proposition that the 'failure to medically screen new inmates may constitute deliberate indifference to medical needs.'" *Gordon*, 6 F.4th at 970 (quoting *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1077 (N.D. Cal. 2014)).[3]

Here, material facts regarding Nurse Nguyen and FNP Millan's mental health screening and treatment of Mr. Gahr's mental health condition remain in dispute, satisfying the first prong of the qualified immunity analysis. Regarding the second prong, the fact that Mr. Gahr's medical condition was chronic rather than acute does not frustrate his constitutional "right to [a] proper medical screening" and adequate medical care. *Gordon*, 6 F.4th at 970. The medical records in possession of Nurse Nguyen and FNP Millan provided a detailed history of the seriousness of his

---

[3] The Ninth Circuit in *Gordon*, 6 F.4th at 970 n.4 also cited *Kodimer ex rel. Lyn Ramskill v. Cnty. of San Diego*, No. 07-CV-2221-BEN, 2010 WL 2635548, at *3–4 (S.D. Cal. June 30, 2010) (relying on *Gibson* to deny screening nurse's motion for summary judgment where the nurse declined to order immediate psychological evaluation for inmate despite clinical indications of psychiatric symptoms); *Bravo v. City of Santa Maria*, No. CV 06-6851 FMO (SHX), 2013 WL 12224038, at *13 (C.D. Cal. July 19, 2013) ("[I]n *Gibson*, the Ninth Circuit ruled that a plaintiff could establish 'direct' liability of a County by showing its policies and procedures failed to adequately screen and protect the rights of mentally ill detainees to medical care.") (citation omitted); *Fricano v. Lane Cnty.*, No. 6:16-CV-01339-MC, 2018 WL 2770643, at *11 (D. Or. June 8, 2018) ("[T]he failure to screen for an entire category of serious medical need (i.e., mental health crises)—a category which may require outside treatment prior to jail admission—could be viewed as creating a substantial risk of serious harm.") (citing *Gibson*, 290 F.3d at 1189). These cases show consensus in the Ninth Circuit which clearly establishes a pretrial detainee's right to adequate mental health screening and treatment.

condition, described above. Nurse Nguyen and FNP Millan did not contact Mr. Gahr to obtain additional information, did not refer him for a mental health evaluation, and did not recommend a treatment plan. After conducting a medical screening of an AIC that revealed a serious medical condition, they took no action. Every reasonable person in Nguyen and Millan's position would have understood that their screening and treatment of Mr. Gahr, or lack thereof, was constitutionally inadequate. Nurse Nguyen and FNP Millan are denied summary judgment on Plaintiff's § 1983 claim.

### III.    *Monell* **Claim Against Marion County**

Plaintiff brings a *Monell* claim against Marion County. Section 1983 permits a cause of action for constitutional violations by persons. In certain circumstances, a municipality may be held liable as a "person" under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). Unlike a claim for negligence, however, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Liability only attaches where the municipality itself causes the constitutional violation through the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

There are three methods by which a plaintiff may establish municipal liability under *Monell*. First, a local government may be liable where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[s] the injury." *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694)). Second, a local government can fail to

train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Third, a local government may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez*, 891 F.3d at 802–03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

Here, the issue is the second method, whether Mr. Gahr's constitutional rights were violated because Marion County failed to provide adequate training on mental health conditions to the Jail's nursing staff. When "a concededly valid policy is unconstitutionally applied by a municipal employee, the [municipality] is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *City of Canton, Ohio*, 489 U.S. at 387. A municipality's failure to train is only actionable when it amounts to "deliberate indifference," which "ordinarily" requires a pattern of similar constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference" where "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* (internal quotations and citations omitted).

Pretrial detainees have a clearly established right to adequate medical screenings and mental health treatment. *Gordon*, 6 F.4th at 970. "Access to the medical staff has no meaning if

the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

HSS Lapham was responsible for supervising the nurses and oversaw the Jail's "nurses train nurses" program. Greenberg Decl. at 23:5-11, 23:12-19, 23:23-24:13 ECF No. 97. She explained in deposition that "[a]ll mental health clients are a huge concern for a jail that wants to prevent suicide" and stated that "suicide [is] the highest leading cause of death in jails." Lapham Dep. at 38:7-8, 37:17. Despite this substantial risk, HSS Lapham admitted that she is "not trained in mental health conditions" and there is "no formal training to the medical staff." Lapham Dep. at 39:7-12, 44:12-25. According to HSS Lapham, no one at the Jail has a duty to provide training on mental health conditions to the nursing staff. Lapham Dep. 44:12-18. She agreed in deposition that there could be a lot more training in all areas for the nursing staff. Lapham Dep. 43:14-15.

Plaintiff provided evidence in the form of an expert opinion showing that the nursing staff's misunderstanding of bipolar disorder deprived Mr. Gahr of his constitutional right to a proper medical screening and adequate medical care. Dr. Waters opined:

> To appropriately screen and refer patients with bipolar . . . it is essential to have an accurate understanding of the disorder, including the primary mood and behavioral features, and the disorder's episodic and chronic (i.e., recurrent) nature.
>
> The resultant misunderstanding of bipolar disorder is reflected in depositions.
>
> For example, Sarah Lapham asserts that if the lithium 'wasn't current, I wouldn't be concerned at that time' and she later asserted that she would conclude that 'he is now better' if not on meds and not symptomatic.
>
> Given the episodic nature of bipolar disorder, someone with a documented history of treatment, a history of experiencing symptom exacerbation when untreated, and not currently receiving treatment is precisely someone who would necessitate a referral for further evaluation.

Waters Decl. ¶ 21.

Plaintiff's *Monell* claim is also supported by the evidence that Commander Larson and Sheriff Kast, as the Jail's policymakers and enactors, knew the importance of providing training on mental health conditions. The Jail requires its deputies to receive training on mental health in jails, to routinely read each policy on mental health in jails, and to acknowledge that they understood those policies. County Defs.' Mot. for Summ. J. at 8, citing Walterman Decl. ¶¶ 14-16, ECF No. 77. Those training materials stated, in part, "[a]s a first responder, it is important to remember that there is a higher likelihood of attempted and completed suicides among those with bipolar disorder than any other behavioral disorder." CorrectionsOne Academy at 9. The record shows that the Jail's nurses did not receive this training or similar training from other sources, as evidenced by HSS Lapham's deposition testimony:

> Q. And you're not trained that bipolar disorder is a more heightened risk of suicide than those other things you just listed such as mental health issues like depression or just general environmental factors such as being incarcerated. . . .
>
> A. Correct. I'm not trained in mental health conditions.

Lapham Dep. at 38:25, 39:1-8.

The obviousness of the risk in failing to provide the nursing staff with adequate training on mental health is further evidenced by a previous lawsuit against the Jail. In *Hernandez v. Marion Cnty.*, No. 3:15-CV-01070-AA, 2017 WL 6029605, at *4 (D. Or. Dec. 3, 2017), the "plaintiff . . . provided sufficient evidence to create a genuine issue of material fact about whether it was the unofficial custom of Marion County to provide inadequate mental health services to inmates at risk of suicide." Although that case was settled prior to a trial on the merits, Marion County was on notice in this action of the constitutional implications of failing to ensure that its detainees receive adequate mental health services, which requires adequate training to its nurses.

The consequences of failing to provide mental health training to the nursing staff in an environment where suicide is the highest leading cause of death is obvious. A jury must decide whether these training failures amounted to deliberate indifference and caused the deprivation of Mr. Gahr's constitutional rights. Marion County is denied summary judgment on Plaintiff's § 1983 claim.

## IV.    State Law Negligence

County Defendants assert discretionary immunity on Plaintiff's First Claim for Relief for Negligence and Wrongful Death. Defendants also argue their conduct did not create an unreasonable risk of harm nor cause Mr. Gahr's death.

### A.    Discretionary Immunity

Marion County, Sheriff Kast, Commander Larson, Nurse Nguyen, HSS Lapham, and Deputy Tilson ("County Defendants") assert that they are entitled to discretionary immunity on Plaintiff's negligence claims, which bars liability for harm resulting from a policy decision. Plaintiff responds that the policies were deficient and that County Defendants' failures to follow its policies are not entitled to discretionary immunity.

Discretionary immunity is codified under ORS 30.265(6)(c), which provides: "Every public body and its officers, employees and agents acting within the scope of their employment duties . . . are immune from liability for . . . [a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Discretionary immunity requires three elements: "The decision must be the result of a choice involving the exercise of judgment; the decision must involve public policy as opposed to the routine day-to-day decision-making of public officials; and the decision must be exercised by a body or person that has the responsibility or authority to make it." *Verardo v. Oregon Dep't of Transportation*, 319 Or. App. 442 (2022) (citing *Turner v. State*, 359 Or. 644, 653 (2016)).

Decisions involving public policy include "assessments of policy factors, such as the social, political, financial, or economic effects of implementing a particular plan or of taking no action." *Turner*, 359 Or. at 653. In contrast, "[r]outine discretionary decisions made by governmental employees in the course of their day-to-day responsibilities are not policy decisions." *Robbins v. City of Medford*, 284 Or. App. 592, 597 (2017).

 "When a public body owes a duty of care, that body has discretion in choosing the means by which it carries out that duty." *Hughes v. Wilson*, 345 Or. 491, 496 (2008) (en banc). "The range of permissible choices does not, however, include the choice of not exercising care." *Mosley v. Portland Sch. Dist. No. 1J*, 315 Or. 85, 92 (1992). For example, when designing a refuse transfer center, the county's engineers in *Garrison v. Deschutes Cnty.*, 334 Or. 264, 269 (2002), decided that adding a protective barrier to a concrete slab would make the platform less safe because, among other reasons, they believed "that a railing might give people a false sense of security, possibly resulting in a higher risk of accident." After concluding that alternative designs presented their own safety problems and economic disadvantages, they chose to install "a railroad tie at the edge of the platform . . . to ensure that no one backed a vehicle beyond where it was safe, but they rejected all other types of barriers to protect against falls." *Id.* The plaintiff was unloading his truck at the refuse station when he tripped over the railroad tie, falling off the platform and suffering severe injuries. *Id.* at 268–69. In response to the county's motion for summary judgment on the plaintiffs' negligence claim, the plaintiffs asserted "that they had retained an expert who would testify at trial that the design of the transfer station was unreasonably dangerous." *Id.* at 269. The trial court granted the county's motion for summary judgment, and the Oregon Supreme Court affirmed, explaining:

 For various reasons, [the engineers] concluded that protective barriers actually would make the platform *less safe*. We assume for purposes of this opinion that that

conclusion might have been both wrong and negligently reached. Nonetheless, the uncontroverted evidence of that thinking process establishes conclusively that this is not a case in which the decision-makers simply disregarded their duty to protect the public. On the contrary, with their decision, even if it was flawed, they exercised their discretion and chose to protect the public in a particular way. Plaintiffs wish to argue that the county should have done something more, or something different, but that argument is the kind of second-guessing that is defeated by [discretionary] immunity.

*Id.* at 276. The engineers' design decision was protected by discretionary immunity because it involved public policy considerations and the exercise of judgment. *Id.*

In contrast, discretionary immunity does not protect a government employee's failure "to apply an otherwise immune policy to a particular case." *Westfall v. State ex rel. Oregon Dep't of Corr.*, 355 Or. 144, 160 (2014). For example, in *Brennen v. City of Eugene*, 285 Or. 401, 415–16 (1979), the Oregon Supreme Court ruled that a city employee was not entitled to discretionary immunity when they decided to issue a license to an uninsured taxi company when that decision violated a city policy prohibiting employees from issuing licenses to uninsured applicants.

Here, Commander Larson and Sheriff Kast promulgated the Jail's policies on intake procedures, supervision, and housing of its detainees. Plaintiff's expert's opinion, that the Jail's policies fall below state and national standards, is well reasoned and supported by the record. *See* Waters Decl. ¶¶ 14, 17-19, 22-26. However, like the plaintiffs' expert's opinion in *Garrison*, that the engineers' design was unreasonably dangerous, here too, discretionary immunity protects Commander Larson and Sheriff Kast's decision to implement specific policies, regardless of the risks evidenced by Plaintiff's expert. Immunity for these policy decisions extends to Marion County as well. Summary judgment is granted in favor of Commander Larson, Sheriff Kast, and

Marion County on Plaintiffs' negligence claim as it relates to the promulgation of inadequate polices and protocols.[4]

Like the city employee's decision in *Brennen* to issue a license in violation of the city's policy, Plaintiff's allegations that Deputy Tilson, Nurse Nguyen, and FNP Millan did not follow the Jail's protocols when deciding how to conduct Mr. Gahr's intake and medical screening is not protected by discretionary immunity. Similarly, Plaintiff's allegations that HSS Lapham and Dr. Loberg failed to provide adequate supervision and training to the medical staff is not a decision protected by discretionary immunity.

### B.    Negligence

Defendants assert they are entitled to summary judgment on Plaintiff's negligence claim because their conduct did not unreasonably create a foreseeable risk that Mr. Gahr would harm himself and was not the cause of his death. Plaintiff responds that Defendants, "at all stages including: booking, screening, 48-hour nursing follow-up, and during the entire duration that Mr. Gahr was lodged, failed to refer Mr. Gahr, an individual with a serious and chronic mental health illness to mental health professionals." Pl.'s Mem. In Opp. to Mot. for Summ. J. at 18, ECF No. 88. Plaintiff alleges that this failure breached the duty to provide necessary medical care to AIC's and exacerbated Mr. Gahr's medical condition, leading to his suicide.

Under Oregon law, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the

---

[4] Dr. Loberg did not raise discretionary immunity when moving for summary judgment and the Court does not address it. As described below, a jury may find that he negligently adopted policies which fell below the standard of care, harming Mr. Gahr.

plaintiff." *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987). ORS 169.140 creates a special relationship and duty between a jailor and their detainees: "The keeper of each local correctional facility shall . . . supply [all AICs] with wholesome food, fuel and necessary medical aid." The internal operating procedures and adopted policies, such as a jail's policies and procedures, provide the standards that corrections personnel are expected to meet and are admissible to indicate the level of care owed to detainees. *Cole v. Multnomah Cnty.*, 39 Or. App. 211, 218 (1979). Such procedures are "in the nature of an admission of the care required in the circumstances and [are] analogous to evidence of the usual methods used in the circumstances." *Id.* (internal citations omitted).

### 1.    Deputy Tilson

Deputy Tilson conducted Mr. Gahr's inmate health screening. MCSO Policy 3110 details how the Jail's staff should identify and care for AICs experiencing suicidal behavior. MCSO Policy 3110, ECF No. 92-10. During intake, employees must observe all AICs "for depressed and/or suicidal behavior, or the possibility of extreme situational stressors that warrant immediate intervention." *Id.* at ¶ 1. Employees are to use "observation and verbal skills to recognize situational and behavioral risk factors that warrant immediate intervention and reporting." *Id.* at ¶ 2. If an employee makes such a finding, they must report it to the Jail's Health Services or Mental Health Services staff. *Id.* at ¶ 3. The Jail's deputy training on mental health in jails advises that "[o]fficers should attempt to identify inmates with mental illness and refer them for professional treatment." CorrectionsOne Academy at 3. The deputy training materials indicate that people with bipolar disorder have a higher suicide risk than any other behavioral disorder and that lithium is used to treat bipolar disorder. CorrectionsOne Academy at 9, 12.

During intake, Deputy Tilson recorded that Mr. Gahr had been prescribed lithium, he recorded that Mr. Gahr was not thinking of hurting or killing himself, and he recorded that Mr.

Gahr had been treated for a mental condition at Kaiser Permanente within the last three months. Deputy Tilson could have referred Mr. Gahr directly to mental health services. Larson Dep. at 32:15-16. Instead, he completed the intake form, booked Mr. Gahr, and forwarded the intake form to the Jail's nurses for review.

On this record there remains a dispute of fact about whether Deputy Tilson's conduct unreasonably created a foreseeable risk of harm. Although Deputy Tilson did not act with deliberate indifference, material issues of fact preclude summary judgment on Plaintiff's negligence claim. Mr. Gahr's indication during intake that he was not suicidal is not dispositive of Plaintiff's negligence claim. A reasonable jury could conclude that Deputy Tilson should have flagged Mr. Gahr as someone with a mental illness and directly referred him to mental health services. Plaintiff's expert's opinion that the failure to treat Mr. Gahr's mental health condition exacerbated the condition, culminating in his death, creates a dispute of fact on causation. Deputy Tilson is denied summary judgment on Plaintiff's negligence claim.

### 2.    Nurse Nguyen and FNP Millan

As described above, there is evidence in this record that Nurse Nguyen and FNP Millan acted with deliberate indifference. *See* Section II(B)(2) and (3). MCSO Policy 3110 directs healthcare staff to "refer to the M.D. or psychiatric nurse practitioner all AICs who are assessed to be seriously ill." Standard Nursing Protocol — Bipolar provides that if there is "potential for self harm, [or] potential for suicide, . . . refer [the] patient [to] the QMHP list for evaluation." Mr. Gahr was never referred to a mental health practitioner for evaluation and Nurse Nguyen and FNP Millan failed to contact Mr. Gahr as part of their medical screening. *See* MCSO Policies 3710 and 3715. A reasonable jury could conclude that these policies applied to Mr. Gahr, that Nurse Nguyen and FNP Millan knew or should have known that Mr. Gahr was seriously ill, and that the failure to follow these policies created an unreasonable risk that Mr. Gahr's untreated

medical condition would result in self-harm. Plaintiff's expert's opinion that this failure exacerbated Mr. Gahr's mental health condition, culminating in his death, creates a dispute of fact on causation. Nurse Nguyen and FNP Millan are denied summary judgment on Plaintiff's negligence claim.

>           3.    HSS Lapham

On this record there remains a dispute of fact about whether HSS Lapham provided inadequate supervision and training to the Jail's nurses. This claim extends to Marion County as well. As described above, HSS Lapham supervised the Jail's nurses. Yet none of the Jail's nurses, including HSS Lapham, received any substantive training on mental health conditions. HSS Lapham agreed in deposition that the nursing staff could use more training. Lapham Dep. 43:14-15. A reasonable inference can be drawn that failing to provide mental health training to the nursing staff in an environment where suicide is the highest leading cause of death creates a substantial risk of serious harm. A reasonable jury could also find that HSS Lapham's lack of training in such an environment amounted to negligent supervision. Plaintiff's expert's opinion that the failure to treat Mr. Gahr's mental health condition exacerbated the condition, culminating in his death, creates a dispute of fact on causation which can be causally linked to HSS Lapham's supervision and training of the nurses. HSS Lapham is denied summary judgment on Plaintiff's negligence claim.

>           4.    Dr. Loberg

Dr. Loberg argues that the harm to Mr. Gahr was caused by the individual defendants' failure to follow the Standard Nursing Protocols and that he was not responsible for supervising or training the nurses on mental health.

Dr. Loberg collaborated with a nurse under HSS Lapham's supervision to promulgate the Jail's Standard Nursing Protocols. Loberg Depo at 23:2-13, ECF No. 92-31. The Standard

Nursing Protocols are used to screen for mental illness and dictate what procedure to follow when a mental health illness is discovered. Plaintiff provides evidence by way of expert opinion that the Standard Nursing Protocols were inadequate. Waters Decl. ¶¶ 21, 24-26. For example, Plaintiff's expert opines that the Jail's Standard Nursing Protocol for bipolar disorder fails to identify bipolar disorder as episodic and chronic, which resulted in a failure to identify the seriousness of Mr. Gahr's condition. *Id.* at ¶¶ 21, 25. The record establishes that the nurses' failure to follow the Standard Nursing Protocols was a cause of Mr. Gahr's inadequate medical care. However, a reasonable jury may also conclude that Dr. Loberg's promulgation of deficient protocols created an unreasonable risk of foreseeable harm that the nurses would fail to provide adequate medical care.[5]

The degree to which Dr. Loberg was responsible for supervising and training the nursing staff on how to implement the Standard Nursing Protocols remains in dispute. This theory of liability extends to Marion County as well. HSS Lapham testified that Dr. Loberg provided training to the medical staff as it related to the Standard Nursing Protocols. Lapham Dep. at 36:9-14. Dr. Loberg agreed in deposition that he provided the nurses with "some standing guidelines that they can go by to assess patients, and they call me with questions on those." Loberg Depo at 12:1-4, ECF No. 92-31. The record contains evidence that the nursing staff failed to follow the Standard Nursing Protocols, creating a dispute of fact about the adequacy of the nurses' supervision and training. For example, Nurse Nguyen agreed in deposition that the lithium notation on Mr. Gahr's intake form should have triggered him to refer Mr. Gahr for a mental health evaluation. Nguyen Dep. at 25:18–24. Plaintiff's expert's opinion that the failure to treat

---

[5] For the reasons explained above, liability for the promulgation of deficient protocols does not extend to Marion County because it successfully asserted discretionary immunity.

Mr. Gahr's mental health condition exacerbated the condition, culminating in his death, creates a dispute of fact on causation which can be causally linked to Dr. Loberg's supervision and training of the nurses.

On this record there remains a dispute of fact about whether the Jail's Standard Nursing Protocols were deficient, whether Dr. Loberg failed to address those deficiencies, and whether Dr. Loberg failed to provide adequate supervision and training to the nurses tasked with following those protocols. Dr. Loberg is denied summary judgment on Plaintiff's negligence claim.

## V.    Americans with Disabilities Act ("ADA") and ORS 659A.103

Plaintiff alleges that Marion County violated the ADA and ORS 659A.103 by failing to provide Mr. Gahr with meaningful access to mental health care, despite his mental illness disability.[6]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA applies to any local government agency, including local law enforcement agencies. *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (citations omitted). In fact, "mental health services and other activities or services undertaken by law enforcement and provided by correctional facilities to those incarcerated are 'services, programs, or activities of a public entity' within the meaning of the ADA." *Id.* The ADA bars

---

[6] Under ORS 659A.139(1), "ORS 659A.103 to 659A.144 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended by the federal ADA Amendments Act of 2008 and as otherwise amended." (footnote removed). The Court's ADA analysis applies equally to Plaintiff's state law disability claim.

suits for damages against individual defendants. *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006).[7]

To prove a defendant violated the ADA, a plaintiff must show: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Such discrimination can be shown when a public entity "intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017) (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 937–38 (9th Cir. 2008)).

Marion County does not dispute that Mr. Gahr was a qualified individual with a disability and does not dispute Plaintiff's argument that a showing of deliberate indifference to Mr. Gahr's right to adequate medical care is sufficient to survive summary judgment on the Plaintiff's disability claim. As described above, this record shows a dispute of fact about whether Marion County and its agents acted with deliberate indifference to Mr. Gahr's right to adequate medical care. Marion County is denied summary judgment on Plaintiff's disability claim.

## CONCLUSION

For the reasons above, County Defendant's Motion for Summary Judgment (ECF No. 76) and Dr. Loberg and FNP Millan's Motion for Summary Judgment (ECF No. 79) are GRANTED

---

[7] In response to Defendants' motions for summary judgment, Plaintiff clarifies that her disability claim for damages is asserted only against Marion County. Pl.'s Mem. In Opp. to Mot. for Summ. J. at 39-40, ECF No. 88. Summary judgment is granted in favor of the individual Defendants on Plaintiff's ADA and ORS 659A.103 claim.

in part and DENIED in part. Summary judgment is granted in favor of Commander Larson, Sheriff Kast, and Marion County as it relates to the promulgation of policies and protocols on Plaintiff's First Claim for Relief (Negligence – Wrongful Death); summary judgment is granted in favor of Deputy Tilson, Commander Larson, Sheriff Kast, HSS Lapham, and Dr. Loberg on Plaintiff's Second Claim for Relief (42 U.S.C. § 1983); summary judgment is granted in favor of Deputy Tilson, Nurse Nguyen, FNP Millan, Commander Larson, Sheriff Kast, HSS Lapham, and Dr. Loberg on Plaintiff's Third Claim for Relief (*Monell*) and Fourth Claim for Relief (ADA and ORS 659A.103). Summary judgment is denied on all other claims.

DATED this 17th day of March 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge